UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SHAKUR WINGATE,

                                  Plaintiff,                  9:25-cv-00207 (BKS/TWD)

v.

DR. IMTIAZ SAMAD; DR. SUBBARAO RAMINENI;
JOHN/JANE DOES 1-5; and MICHELLE CHERI,

                                  Defendants.
_____

**Appearances:**

*For Plaintiff:*
Stephanie Panousieris
Rickner Moskovitz LLP
14 Wall Street, Suite 4C
New York, New York 10005

*For Defendants:*
Letitia James
Attorney General of the State of New York
Jonathan Pilat-Baxter
Assistant Attorney General
300 South State Street, Suite 300
Syracuse, New York 13202

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

**I.    INTRODUCTION**

Plaintiff Shakur Wingate brings this 42 U.S.C. § 1983 action against Defendants, medical personnel employed by the New York State Department of Corrections and Community Supervision ("DOCCS"). (Dkt. No. 12). Plaintiff asserts that Defendants exhibited deliberate indifference to his serious medical needs during his incarceration at Mohawk Correctional

Facility. Presently before the Court is Defendants' motion to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 24). The motion is fully briefed. (Dkt. Nos. 24-2, 25, 26). For the reasons that follow, the motion is granted.

## II.    FACTS[1]

Plaintiff entered DOCCS custody in the fall of 2018 and completed his term of incarceration in March 2024. (Dkt. No. 12, ¶¶ 19, 75). During that time, Defendants—Drs. Imtiaz Samad and Subbarao Ramineni, nurse administrator Michelle Cheri, and John/Jane Does #1 through 5—were all DOCCS employees working at Mohawk.[2] (*Id.* ¶¶ 11–17).

### A.    Initial Management of Plaintiff's Symptoms

In October 2018, Plaintiff underwent an "initial examination" during which a DOCCS intake nurse noted that he "was experiencing 'stomach problems'" and weighed roughly 165 pounds. (*Id.* ¶ 19). Once at Mohawk, Plaintiff "repeatedly made complaints to medical and requested treatment" for "worsening" gastrointestinal ("GI") symptoms; each visit, however, resulted only in a "brief" vitals check. (*Id.* ¶¶ 20–21). So Plaintiff "began writing" to Cheri, "detailing his symptoms and the lack of adequate care," but "his requests for additional diagnostic care or pain treatment were denied by one or more" Defendants. (*Id.* ¶ 22).

Later, in July 2019, Ramineni examined an x-ray of Plaintiff's abdomen and determined that "nothing was wrong" and "no further action was necessary." (*Id.* ¶ 23). Ramineni reviewed Plaintiff's "routine bloodwork" the next month. (*Id.* ¶ 24). He again told Plaintiff that "nothing was wrong with him, despite [Plaintiff's] worsening symptoms." (*Id.*).

---

[1] The facts are drawn from the amended complaint. (Dkt. No. 12). The Court assumes the truth of, and draws all reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

[2] The amended complaint lists two Defendants named "John/Jane Doe #1," both of whom were "Nutritional Services Administrator[s] . . . and/or regional dietician[s]." (*See* Dkt. No. 12, ¶¶ 14, 15).

Following Ramineni's examinations, Plaintiff submitted a written grievance on October 21, 2019. (*Id.* ¶ 25). The grievance explained that, although the lab work was not "helping [to] find the problem," his "requests" for alternative treatment "were denied, and no further action was taken." (*Id.*). In another November 2019 grievance, Plaintiff asked to be sent to an outside hospital; he had visited medical for "serious issues with [his] stomach . . . numerous times" without any improvement, felt "like [he was] dying," experienced pain when eating, and was "losing weight." (*Id.* ¶ 26). But Samad, Ramineni, Cheri, "and/or Does 3–5" told Plaintiff that "nothing was wrong with him or that nothing more could be done . . . based on" his x-ray and bloodwork results. (*Id.* ¶ 27). "For months," Plaintiff "repeatedly pled with Defendants" for "additional diagnostic testing," "[b]ut each time," he "was accused of lying and fabricating his symptoms by Defendants, including Does 3–5, and was told to stop showing up to sick call and requesting medical attention so frequently." (*Id.* ¶ 28).

Plaintiff's weight loss continued because of his "inability to keep food down." (*Id.* ¶ 29). By January 8, 2020, he weighed 156 pounds; he weighed 151 pounds by January 22. (*Id.* ¶¶ 30–31). "Defendants took no meaningful steps to address" the weight loss or "discomfort." (*Id.* ¶ 32). Plaintiff "wrote dozens of notes" to Cheri, but she told him only that "his care was adequate," and that "he should continue to report to sick call for any symptoms." (*Id.* ¶ 29).

On January 24, Plaintiff "went to sick call with debilitating stomach pain and was told by a nurse, likely Doe 4 or 5, that seeing the doctor would be a 'waste of time,'" as "the doctor had already determined nothing was wrong with him." (*Id.* ¶ 33). Early the next morning, Plaintiff reported to "emergency sick call due to uncontrollable vomiting," but after a vitals check, "was again sent back to his unit." (*Id.* ¶ 35 (emphasis omitted)). He again wrote Cheri to detail the "events of the prior weeks and days." (*Id.* ¶¶ 36–37).

3

On March 3, Plaintiff returned to sick call, "refus[ing] to leave without proper medical attention" and threatening to harm himself. (*Id.* ¶ 38). Days later, he "was cited with a disciplinary infraction," "transferred to a disciplinary unit," and returned to "general population" without any care. (*Id.* ¶ 39). Plaintiff subsequently complained to Cheri on March 16 of "chronic vomiting any time he attempted to eat"; "staff in sick call," however, "told him they did not know what to do to help him," and his complaints "were ignored." (*Id.* ¶ 40).

B.   **Plaintiff's Diagnoses and Hospitalizations**

As Plaintiff's symptoms worsened, "he was sent to the Upstate University Hospital on March 20, 2020, weighing just 144 pounds." (*Id.* ¶ 41). There, doctors diagnosed him with a small bowel obstruction ("SBO"), kept him for observation, and told him he would need surgery. (*Id.* ¶ 42). Due to approval and scheduling "issues with DOCCS[]," the surgery "was scheduled, postponed for a few days, and then cancelled altogether." (*Id.* ¶ 43). Plaintiff returned to Mohawk ten days later with instructions to receive an "anti-inflammatory diet" and prednisone prescription. (*Id.* ¶¶ 44–45). When he "wrote" to medical to report continuing symptoms, "one or more" Defendants told him to "experiment with different foods" to identify those he could eat without pain. (*Id.* ¶ 46). Plaintiff could not eat "more than a few bites of solid food at a time," so by April 8, he weighed only 146 pounds. (*Id.* ¶ 47).

On April 17, Ramineni instructed Plaintiff to continue "a soft diet" and "taper[ed]" his steroids, even though Plaintiff "complain[ed] of ongoing pain and inability to eat." (*Id.* ¶ 48). Plaintiff "returned to the outside hospital" in May for "repeat imaging," which "revealed that the SBO had resolved, likely," Plaintiff says, because he stopped "eating altogether [without] a full liquid diet, which was discontinued prematurely by Defendants." (*Id.* ¶ 49).

On June 3, Plaintiff received a CT scan and diagnosis of "Crohn's disease with complication."[3] (*Id.* ¶ 51). Outside doctors prescribed a liquid diet and "instructed to only drink Ensure until further notice." (*See id.*). However, on June 5, Plaintiff wrote to Cheri to report that Ramineni "and/or" Samad had "discontinued the Ensure diet" prescribed two days earlier. (*Id.* ¶ 52). Several days later, Ramineni "and/or" Samad instructed Plaintiff to "return to solid foods"; he complied, but "immediately experienced pain, bloating, and nausea." (*Id.* ¶ 53). Plaintiff reported these symptoms to Cheri but never returned to a liquid diet, "further exacerbating his symptoms." (*Id.* ¶ 54).

Later that month, after Plaintiff received another scan, "DOCCS was instructed to obtain a 'GI consultation ASAP to start medical treatment' for Crohn's" and to "return[] [Plaintiff] to the exclusively enteral diet which was 'recommended before.'" (*Id.* ¶ 55). Accordingly, Plaintiff met with a GI specialist in August who confirmed that his "scans . . . indicated a history of Crohn's disease." (*Id.* ¶ 56). His Crohn's disease was confirmed again on September 15, 2020, when he was admitted to Upstate University Hospital "for an upper GI endoscopy and colonoscopy to further assess his Crohn's." (*Id.* ¶ 57). His symptoms improved while receiving a liquid diet and "treatment of an intestinal infection." (*Id.* ¶ 58). But "against specialists' advice," "Defendants again returned [Plaintiff] to solid food prematurely," triggering the "immediate[] return[]" of his "pain, bloating, nausea, and vomiting." (*Id.*). Additionally, Plaintiff "needed to begin" injecting Humira, a medication used to treat Crohn's disease; but "Defendants did not provide the injections" and "blamed Plaintiff for his continuing symptoms." (*Id.* ¶¶ 59–60, 70).

---

[3] Although Plaintiff alleges that he was diagnosed with Crohn's disease on June 3, 2020, (Dkt. No. 12, ¶ 51), he also states that Ramineni "not[ed] that his Crohn's disease was 'stable'" in April 2020, (*id.* ¶ 48).

5

Roughly a year later, on September 21 and October 4, 2021, a Doe Defendant told Plaintiff that "his lab results were not indicative of" and "did not reveal evidence of" Crohn's disease. (*Id.* ¶¶ 61–62). According to Plaintiff, Samad "was the driving force behind [this] demonstrably false conclusion." (*Id.* ¶ 63). Plaintiff visited medical on November 2 and "was advised just to avoid foods that ma[d]e him feel bad" and to keep a food journal. (*Id.* ¶ 64).

This "back and forth" continued for eight months until his "symptoms [reached] their zenith due to the Defendants' failure to manage" Plaintiff's prescription medication and dietary needs. (*Id.* ¶ 65). During this time, Defendants "rebuffed" Plaintiff's repeated requests for "more long-term medication for his Crohn's as his specialist had prescribed." (*Id.* ¶ 66).

By June 2022, "Plaintiff could not tolerate solid food." (*Id.* ¶ 67). "[H]e was advised to avoid foods that triggered his symptoms, but received no further care." (*Id.*). In July, he "was . . . transferred to Upstate Medical Facility," presenting with a "'hard and rigid' abdomen.'" (*Id.* ¶¶ 68–69). He "was immediately transferred to Alice Hyde Medical Center, and then to Albany Medical for a higher level of care." (*Id.* ¶ 69). During this hospitalization, Plaintiff's Crohn's disease diagnosis "was again confirmed." (*Id.* ¶ 70 (emphasis omitted)). He was discharged on July 19 with prescriptions for "intermittent" Humira injections and daily doses of Budesonide, another medication used to treat Crohn's disease. (*Id.*).

    C.    **Post-Hospitalization Treatment**

"Plaintiff received these prescriptions for several months while housed at Upstate." (*Id.* ¶ 71). "But in February 2023," he returned to Mohawk "where Dr. Samad took over his care." (*Id.* ¶ 72). "Once again, Defendants began to intentionally deprive Plaintiff of the medications and diet necessary to manage the painful symptoms of his autoimmune disease." (*Id.*). He remained at Mohawk for "several months" with "deficient care," before returning to Upstate, where he received his medication in "sporadic doses." (*Id.* ¶ 73).

On June 2, 2023, Plaintiff's counsel sent a letter to the "Medical Unit and Security Departments concerning the withholding of Plaintiff's prescription medications," but received no reply. (*Id.* ¶ 74). Defendants' "indifference and inconsistent care" persisted until Plaintiff's release. (*Id.* ¶ 75).

### III. STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" are insufficient; rather, a plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). Additionally, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### IV. DISCUSSSION

#### A. Statute of Limitations

Defendants first assert that Plaintiff's Eighth Amendment claim is time barred. (Dkt. No. 24-2, at 8–11). Plaintiff counters that his claim is subject to equitable tolling under the continuing violation doctrine. (Dkt. No. 25, at 6–9). Defendants disagree, arguing that the factual allegations describe "three distinct periods of inadequate medical treatment," not an ongoing policy of deliberate indifference. (Dkt. No. 24-2, at 11; Dkt. No. 26, at 5–8).

"Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer," such a defense "may be decided on a Rule 12(b)(6) motion if [it] appears on the face of the complaint." *Conn. Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc.*, 988 F.3d 127, 131–32 (2d Cir. 2021) (quoting *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015)). "The statute of limitations for § 1983 actions arising in New York is three years." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 308 (2d Cir. 2020); *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009) (noting same in Eighth Amendment deliberate indifference context). "A Section 1983 claim ordinarily 'accrues when the plaintiff knows or has reason to know of the harm.'" *Shomo*, 579 F.3d at 181 (quoting *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994)); *see also Mallet v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 126 F.4th 125, 131–32 (2d Cir. 2025).

However, the "continuing violation doctrine is an 'exception to the normal knew-or-should-have-known accrual date,'" which the Second Circuit has applied to Eighth Amendment claims. *See Shomo*, 579 F.3d at 181–82 (quoting *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999)); *see also Gonzalez v. Hasty*, 802 F.3d 212, 224 (2d Cir. 2015). The doctrine applies "to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Gonzalez*, 802 F.3d at 220; *Tassy v. Buttigieg*, 51 F.4th 521, 532 (2d Cir. 2022). Such claims are "composed of a series of separate acts that collectively constitute one unlawful practice," not of "discrete unlawful acts, even where those discrete acts are part of a 'serial violation.'" *Gonzalez*, 802 F.3d at 220 (alterations adopted) (first quoting *Washington v. Cnty. of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004); then quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)); *see also Lucente*, 980 F.3d at 309.

"To assert a continuing violation" in the deliberate indifference context, "the plaintiff must 'allege both the existence of an ongoing policy of deliberate indifference to [their] serious

8

medical needs and some non-time-barred acts taken in the furtherance of that policy.'" *Shomo*, 579 F.3d at 182 (alteration adopted and modified) (quoting *Harris*, 186 F.3d at 250). When the plaintiff does so, "the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of" the ongoing policy. *See id.* at 181 (quoting *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994)). If the complaint alleges "some [deliberately indifferent] act that did occur within the statute of limitations," *Harris*, 186 F.3d at 250, and "[t]he complaint suggests a pattern" of deliberately indifferent treatment, *Shomo*, 579 F.3d at 182, the Eighth Amendment claim can withstand a Rule 12(b)(6) challenge. But as to claims involving multiple individual defendants, the plaintiff must "allege[] an unconstitutional act committed by each particular defendant that falls within the three-year statutory period." *See Lucente*, 980 F.3d at 310; *see also Shomo*, 579 F.3d at 183 (holding the doctrine inapplicable to individual-defendant claim in the absence of any "indication that [the plaintiff could] allege acts involving [that defendant falling] within the three-year statutory period").

Plaintiff commenced this action on February 12, 2025. (*See* Dkt. No. 1). For his Eighth Amendment claim to be timely under the continuing violation doctrine, the complaint must have plausibly alleged some act in furtherance of a pattern of deliberate indifference which occurred after February 12, 2022. *See Shomo*, 579 F.3d at 181–82. Even assuming the amended complaint reflects such an ongoing pattern, it contains only one allegation concerning a specific defendant during the statutory period. (*See* Dkt. No. 12, ¶ 72 ("[I]n February 2023, Plaintiff was returned to Mohawk, where Dr. Samad took over his care.")). Samad's act of resuming control over Plaintiff's care, alone, was not an act in furtherance of any ongoing deliberate indifference. *See Iqbal*, 556 U.S. at 678–79.

9

The remaining allegations during the statutory period are similarly deficient. Some are conclusory, and none differentiate among defendants, instead alleging acts taken by all "Defendants" as a group.[4] Given these grouped and conclusory allegations, the Court cannot discern which "particular defendant," during the statutory period, undertook specific acts in furtherance of a policy of deliberate indifference. *Lucente*, 980 F.3d at 310; *cf. Iqbal*, 556 U.S. at 678–79. Accordingly, the continuing doctrine violation does not apply, and Plaintiff's Eighth Amendment claim—as set forth in the amended complaint—is time barred.

### B.  Deliberate Indifference

The parties also dispute whether Plaintiff has stated a plausible deliberate indifference claim. (Dkt. No. 24-2, at 11–15; Dkt. No. 25, at 9–12; Dkt. No. 26, at 8–10). The Eighth Amendment, applicable to the states through the Fourteenth Amendment, *see Robinson v. California*, 370 U.S. 660, 666–67 (1962), prohibits the infliction of cruel and unusual punishment. U.S. Const. amend. VIII. "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to his serious medical needs.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (alteration adopted) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). That standard "includes both subjective and objective components." *Id.*; *see also Clark v. Valletta*, 157 F.4th 201, 209 (2d Cir. 2025). To satisfy the subjective component, an "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Clark*, 157 F.4th at 209 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

---

[4] (*See* Dkt. No. 12, ¶ 65 ("Plaintiff's symptoms would reach their zenith due to the *Defendants'* failure to manage Plaintiff's Crohn's . . . ." (emphasis added)); *id.* ¶ 66 ("His requests continued to be rebuffed by the *Defendants*." (emphasis added)); *id.* ¶ 72 ("Once again, *Defendants* began to intentionally deprive Plaintiff of the medications and diet necessary to manage the painful symptoms of his autoimmune disease." (emphasis added)); *id.* ¶ 75 ("This indifference and inconsistent care by *Defendants* continued until Plaintiff's release from incarceration in March 2024." (emphasis added))).

10

Although the amended complaint must be dismissed as time barred, the Court notes that, on the merits, it also fails to plausibly allege the subjective component. The complaint's grouped, conclusory allegations do not explain the specific actions taken by each individual defendant, much less those defendants' subjective mental state. *See Chance*, 143 F.3d at 702; *Clark*, 157 F.4th at 209. Such "impermissible group pleading" cannot state a plausible Eighth Amendment claim. *See Williams v. Novoa*, No. 19-CV-11545, 2022 WL 161479, at *10, 2022 U.S. Dist. LEXIS 8657, at *24 (S.D.N.Y. Jan. 18, 2022) (collecting cases).

### C.　Leave to Amend

In addition to opposing Defendants' motion, Plaintiff in the alternative requests leave to amend. (Dkt. No. 25, at 12–13, 14). Defendants oppose this request, arguing that amendment would be futile. (Dkt. No. 26, at 11–13).

"Federal Rule of Civil Procedure 15(a) provides that if a party has already 'amended its pleading once as a matter of course,' as [Plaintiff] has here, [he] 'may amend [his] pleading only with the opposing party's written consent or the court's leave.'" *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 90 (2d Cir. 2023) (alteration adopted) (quoting Fed. R. Civ. P. 15(a)(1)–(2)). "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *see McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). But district courts have discretion to deny leave to amend "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *MSP Recovery*, 66 F.4th at 90 (quoting *Bensch v. Est. of Umar*, 2 F.4th 70, 81 (2d Cir. 2021)); *McCarthy*, 482 F.3d at 200.

Here, the Court will allow Plaintiff to file a second amended complaint. Although Defendants assert that amendment would be futile, Plaintiff represents that he "can add facts that support his allegations of a continuing practice of deliberate indifference," including "additional

11

factors demonstrating the continuous care (or lack thereof) by Defendants of Plaintiff." (Dkt. No. 25, at 13). Such additional facts may cure the deficiencies identified above. Indeed, as the Second Circuit has explained: "Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015). No other "good reason" to deny leave is apparent, so the Court will allow Plaintiff to amend. *MSP Recovery*, 66 F.4th at 90; *see also Mandala v. NTT Data, Inc.*, 88 F.4th 353, 363 (2d Cir. 2023) ("[I]n the absence of a valid rationale like undue delay or futility, it is improper to simultaneously dismiss a complaint with prejudice under Rule 12(b)(6) and deny leave to amend when the district court has not adequately informed the plaintiffs of its view of the complaint's deficiencies.").

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion to dismiss, (Dkt. No. 24), is **GRANTED**; and it is further

**ORDERED** that the amended complaint, (Dkt. No. 12), is **DISMISSED without prejudice**; and it is further

**ORDERED** that Plaintiff's request to file a second amended complaint, (Dkt. No. 25, at 14), is **GRANTED**, and he may file a second amended complaint, addressing the deficiencies described above, within thirty (30) days of the date of this Order. If Plaintiff fails to file a second amended complaint within that time, the Clerk is directed to close this case without further order.

IT IS SO ORDERED.

Dated: January 7, 2026
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge