UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

SHAKUR WINGATE,

                            Plaintiff,                    9:25-cv-00207 (BKS/CBF)

v.

DR. IMTIAZ SAMAD, DR. SUBBARAO RAMINENI,
MICHELLE CHERI, and JOHN/JANE DOES 1-5,

                            Defendants.

---

**Appearances:**

*For Plaintiff:*
Stephanie Panousieris
Rickner Moskovitz LLP
14 Wall Street, Suite 4C
New York, New York 10005

*For Defendants:*
Letitia James
Attorney General of the State of New York
Anna R. Wright
Assistant Attorney General
300 South State Street, Suite 300
Syracuse, New York 13202

**Hon. Brenda K. Sannes, Chief United States District Judge:**

### MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

Plaintiff Shakur Wingate brought this 42 U.S.C. § 1983 action against Defendants—

various New York State Department of Corrections and Community Supervision ("DOCCS")

medical personnel—stemming from his incarceration at Mohawk Correctional Facility. (Dkt. No.

30). The Court dismissed Plaintiff's first amended complaint as barred by the statute of

limitations, concluding that Plaintiff failed to allege that the continuing violation doctrine applied

to his Eighth Amendment deliberate indifference claims. (Dkt. No. 29). Presently before the Court is Defendants' motion to dismiss Plaintiff's second amended complaint under Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 32). The motion is fully briefed. (Dkt. Nos. 32, 33, 34). For the reasons that follow, the motion is denied.

## II.    FACTS[1]

Plaintiff entered DOCCS custody in the fall of 2018 and remained incarcerated until March 2024. (Dkt. No. 30, ¶¶ 18, 67). Throughout this time, Defendants—Dr. Imtiaz Samad, Dr. Subbarao Ramineni, and nurse administrator Michelle Cheri—worked as DOCCS employees at Mohawk.[2] (*Id.* ¶¶ 11–13, 17).

### A.    Initial Management of Plaintiff's Symptoms

In October 2018, a non-party intake nurse evaluated Plaintiff, who complained of "stomach problems" and weighed 165 pounds. (*Id.* ¶ 18). After arriving at Mohawk later that year, Plaintiff "repeatedly" reported worsening gastrointestinal ("GI") symptoms and requested treatment. (*Id.* ¶ 19). But each visit to Mohawk's medical unit "typically included" only "a brief check of Plaintiff's vital signs." (*Id.*). Between 2018 and 2019, Ramineni became one of Plaintiff's "primary medical providers," assuming responsibility "for overseeing Plaintiff's medical care, diagnostic testing, and treatment of any injuries or chronic conditions." (*Id.* ¶ 20). Cheri was Mohawk's nurse administrator, "serving as both a provider within the facility and a liaison between Plaintiff and his medical doctor." (*Id.* ¶ 21).

---

[1] The facts are drawn from the second amended complaint. (Dkt. No. 30). The Court assumes the truth of, and draws all reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

[2] Plaintiff has also sued five additional unnamed Mohawk medical and corrections staff members, which this decision does not address. (*See* Dkt. No. 30, ¶¶ 14–16).

By July 2019, "after months of Plaintiff's complaints about worsening GI symptoms," Ramineni ordered an abdominal x-ray, but "told Plaintiff nothing was wrong." (*Id.* ¶ 22). "Less than two months later," as Plaintiff's "symptoms continued to worsen," Ramineni "ordered routine bloodwork." (*Id.* ¶ 23). Again, Ramineni told Plaintiff "nothing was wrong." (*Id.*).

Still "without answers concerning his chronic GI symptoms," Plaintiff wrote to Cheri explaining those symptoms and "the lack of adequate care." (*Id.* ¶ 24). Specifically, starting in September 2019, Plaintiff sent Cheri "at least eight written requests" for "additional diagnostic testing," reporting "weight loss, substantial pain, [and] an inability to eat." (*Id.* ¶¶ 24–25). Cheri responded to Plaintiff, maintaining "that his care was adequate and there was nothing she could do to help him." (*Id.* ¶ 26). "Plaintiff repeatedly pled with" Cheri and Ramineni for "additional diagnostic testing"—but each time he visited sick call, "staff members on duty, including Cheri, accused Plaintiff of fabricating his symptoms, and told him to stop requesting medical attention so frequently." (*Id.* ¶ 27). Plaintiff also filed grievances concerning his treatment, all of which, he says, "were known to or shared with" Cheri and Ramineni by investigators. (*Id.* ¶ 28).

Plaintiff's medical records reflect that, sometime between 2020 and 2021, Ramineni and Samad became "jointly charged with monitoring and tending to [his] serious medical needs." (*See id.* ¶ 29). Both "appear throughout [Plaintiff's] medical documentation during this period," and both "had access to Plaintiff's medical history," making them "aware of his worsening symptoms" and requests for help. (*Id.*). By early 2020, "Plaintiff's weight loss accelerated rapidly"; he could not "eat solid foods or keep anything down," "symptoms he [had] repeatedly reported to his providers." (*Id.* ¶ 30). He weighed 156 pounds on January 8, 2020, and 151 pounds on January 22. (*Id.* ¶¶ 31–32).

3

On January 24, "Plaintiff went to sick call with debilitating stomach pain." (*Id.* ¶ 33). But an unnamed Defendant sent Plaintiff away "without help," explaining "that seeing a doctor would be a 'waste of time,' because [Ramineni and Samad] had already determined nothing was wrong with him." (*Id.*). Early the next morning, Plaintiff reported to emergency sick call for "uncontrollable vomiting"; staff again checked his vitals and sent him back to his dorm. (*Id.* ¶ 34). Plaintiff wrote to Cheri on January 26 and February 4, 2020 to "relay[] the events of the prior weeks and days, again begging for help." (*Id.* ¶ 35). But he "received no additional medical attention in response to his complaints." (*Id.*).

Later, in March 2020, Plaintiff went to sick call and refused to leave without treatment for his GI symptoms, threatening to harm himself if denied care. (*Id.* ¶ 36). Instead of treatment, Plaintiff received a disciplinary infraction. (*Id.*). On March 16, Plaintiff wrote to Cheri yet again, explaining that he experienced "chronic vomiting any time he attempted to eat." (*Id.* ¶ 38). He also reported to Cheri "that staff in sick call told him they did not know what to do to help him because his doctors had determined nothing was wrong." (*Id.*). The doctors' and Cheri's "insistence that nothing was wrong," Plaintiff says, "caused on-duty staff to send Plaintiff away without help each time he asked for it." (*Id.* ¶ 37).

### B.    Plaintiff's Diagnoses and Hospitalizations

Plaintiff's symptoms worsened until March 20, 2020, when he was sent to Upstate University Hospital, weighing only 144 pounds. (*Id.* ¶ 39). Staff at Upstate diagnosed Plaintiff with a small bowel obstruction ("SBO"), kept him for observation, and told him "a surgery was forthcoming." (*Id.* ¶ 40). After ten days at Upstate, Plaintiff returned to Mohawk. (*Id.* ¶ 41). "His discharge instructions made clear that he should be given an anti-inflammatory diet of 5.5 Ensures per day with no other liquids or foods other than water"; doctors also prescribed prednisone. (*Id.*). When Plaintiff returned to Mohawk, his symptoms continued, and "he wrote

4

medical for help." (*Id.* ¶ 42). But Mohawk staff instructed Plaintiff to "experiment with different foods and 'figure out' what he could eat" without pain. (*Id.*). Plaintiff could only eat a few bites at a time, and by April 8, he weighed 146 pounds. (*Id.*).

Ramineni and Samad "discontinued" or "failed to "properly refill[]" his liquid diet, so Plaintiff "ceased eating altogether." (*Id.* ¶ 43). As a result, Plaintiff explains, repeat imaging taken on May 14 at Upstate revealed that the SBO had resolved. (*Id.*). Upstate sent Plaintiff back to Mohawk with an Ensure prescription and instructed "that he undergo additional diagnostic testing." (*Id.* ¶ 44). Plaintiff "received another CT scan" on June 3 "and was discharged with a diagnosis of 'Crohn's disease with complication.'" (*Id.* ¶ 45). Discharge notes "again prescribed a liquid diet," instructing that Plaintiff "only drink Ensure until further notice." (*Id.*). But two days later, Plaintiff wrote to Cheri to report "that his providers had discontinued the Ensure diet." (*Id.* ¶ 46). And on June 9, "Ramineni and/or Samad . . . told Plaintiff he no longer required a liquid diet and should return to solid foods." (*Id.* ¶ 47). "That night, Plaintiff attempted to eat soup[] and immediately experienced pain, bloating, and nausea"; he "reported these issues to Cheri the following day, but his complaints went unaddressed." (*Id.* ¶ 48). Following a June 22 scan, "DOCCS was instructed to obtain a 'GI consultation ASAP to start medical treatment' for Crohn's." (*Id.* ¶ 49). That "order"—sent "directly" to Ramineni "by Plaintiff's GI specialists"— "reiterated that Plaintiff should be returned to the exclusively enteral diet" reflected on previous discharge notes. (*Id.*).

Plaintiff returned to Upstate on September 15 "for an upper GI endoscopy and a colonoscopy to further assess his Crohn's," a diagnosis doctors "confirmed once again." (*Id.* ¶ 50). Following this visit, Plaintiff received a "re-prescribed liquid diet and treatment [for] an intestinal infection"—and "[f]or a short time," his "symptoms were somewhat alleviated." (*Id.*

¶ 51). But "Ramineni and/or Samad again returned Plaintiff to solid food prematurely—against the specialists' advice—and his pain, bloating, nausea, and vomiting immediately returned." (*Id.*). Although medical records reflect that Plaintiff "needed to begin Humira injections" to treat his Crohn's, "neither Ramineni nor Samad ordered the necessary injections and only treated Plaintiff's immediate symptoms in the short term, allowing his chronic condition to worsen over time." (*Id.* ¶ 52).

After a year without that necessary treatment, a non-party nurse informed Plaintiff on September 21, 2021 that his lab results did not "indicat[e]" Crohn's disease. (*See id.* ¶ 53). The nurse repeated this response on October 4, noting in records "that his tests 'did not reveal evidence of Crohn's.'" (*Id.*). Ramineni and Samad, according to Plaintiff, "were the driving force behind the . . . conclusion that Plaintiff did not suffer from Crohn's," or that he did not need "long term treatment for the disease in the form of injectables and a prescription diet." (*Id.* ¶ 54).

This "back and forth" continued for another eight months, between October 2021 and June 2022. (*Id.* ¶¶ 55, 71–73). During that time, Plaintiff says, he "continued his visits to sick call when his Crohn's symptoms flared, and repeatedly inquired with his doctors about receiving the . . . injections that would offer long-term management of his condition." (*Id.* ¶ 56). But Cheri, Ramineni, and Samad "ignored or rebuffed" those requests. (*Id.* ¶ 57). Additionally, on multiple occasions during this time period—and as far back as April 2020—"Samad personally represented to Plaintiff . . . that despite multiple diagnoses at outside hospitals, he did not believe Plaintiff had Crohn's Disease, and refused him proper treatment as a result." (*See id.* ¶ 64).

By June 2022, Plaintiff "could not tolerate solid food" but still "received no further care beyond a recommendation to avoid foods that upset his stomach." (*Id.* ¶ 58). So on July 14, 2022—after Plaintiff went to the infirmary with "severe abdominal pain," vomiting, and "a 'hard

and rigid' abdomen"—staff transferred him first to Alice Hyde Medical Center, and then to Albany Medical "for a higher level of care." (*Id.* ¶ 59). During this hospitalization, doctors again confirmed Plaintiff's Crohn's diagnosis and "suspected" that he had another SBO. (*Id.* ¶ 60). Albany Medical physicians noted that "Plaintiff had not received the necessary medications" prescribed following his March 2020 hospitalization. (*Id.* ¶ 61). And a "hospitalist's records also indicate[d] that, 'when Plaintiff returned to the prison[,] he was not started on the necessary medications due to concerns that the Crohn's disease was a misdiagnosis.'" (*Id.* ¶ 62 (alterations adopted)). After six days, Plaintiff was discharged "with a daily Budesonide prescription and a plan to receive intermittent injections of Humira." (*Id.* ¶ 65).

### C.    Post-Hospitalization Treatment

Plaintiff eventually returned to Mohawk, where "Samad took over [his] care" and "once again obstructed his access to the medications and diet necessary to manage the painful symptoms of his autoimmune disease." (*Id.* ¶ 66). Cheri also "did nothing to facilitate the care Plaintiff needed upon his return to Mohawk." (*Id.* ¶ 71). Samad's "indifference and inconsistent care" continued from February 2023 until Plaintiff's March 2024 release. (*See id.* ¶¶ 66–67).

## III.    STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inv.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" are insufficient; rather, a plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d

7

Cir. 2007)). Additionally, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV.    DISCUSSION

### A.    Statute of Limitations

Defendants assert that Plaintiff's Eighth Amendment claims are time barred. (Dkt. No. 32, at 12–16). Plaintiff counters that his claims are subject to equitable tolling under the continuing violation doctrine. (Dkt. No. 33, at 14–17). Defendants disagree, arguing that Plaintiff failed to plausibly allege an ongoing policy of deliberate indifference, or any non-time-barred act in furtherance of such a policy. (Dkt. No. 32, at 14–16; Dkt. No. 34, at 4–6).

As the Court previously explained, "[t]he statute of limitations for § 1983 actions arising in New York is three years." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 308 (2d Cir. 2020); *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009). "The continuing violation doctrine is an 'exception to the normal knew-or-should-have-known accrual date,'" which the Second Circuit has applied to Eighth Amendment claims. *See Shomo*, 579 F.3d at 181–82 (quoting *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999)); *see also Gonzalez v. Hasty*, 802 F.3d 212, 224 (2d Cir. 2015). "To assert a continuing violation" in the deliberate indifference context, "the plaintiff must 'allege both the existence of an ongoing policy of deliberate indifference to [their] serious medical needs and some non-time-barred acts taken in the furtherance of that policy.'" *Shomo*, 579 F.3d at 182 (alteration adopted and modified) (quoting *Harris*, 186 F.3d at 250). If the complaint alleges "some [deliberately indifferent] act that did occur within the statute of limitations," *Harris*, 186 F.3d at 250, and "suggests a pattern" of deliberately indifferent treatment, *Shomo*, 579 F.3d at 182, the Eighth Amendment claim can withstand a Rule 12(b)(6) challenge. As to claims involving multiple individual defendants, the

8

complaint must "allege[] an unconstitutional act committed by each particular defendant that falls within the three-year statutory period." *Lucente*, 980 F.3d at 310; *Shomo*, 579 F.3d at 183.

Here, Plaintiff has plausibly alleged the existence of an ongoing policy of deliberate indifference, and that each Defendant took some act in furtherance of that policy after February 12, 2022. His claims are therefore timely. *See Shomo*, 579 F.3d at 182; (Dkt. No. 29, at 9).

As described above, Plaintiff alleges that, from 2019 to 2022, Defendants knew of his serious stomach condition—including his Crohn's Disease—but failed to provide proper treatment. (*See* Dkt. No. 30, ¶¶ 22–29, 33–38, 42–43, 46–49, 51–52, 54–58). And even after his hospitalization, Plaintiff says, Defendants failed to administer the treatment outside doctors had specifically prescribed for his Crohn's. (*See id.* ¶¶ 46–52, 56–57, 61–62, 64, 66–67, 71–73). Defendants argue that these allegations do not constitute an ongoing policy of deliberate indifference, but rather "discrete incidents" that "are not causally connected to each other." (*See* Dkt. No. 32, at 14–15; Dkt. No. 34, at 4–6). But drawing all reasonable inferences in Plaintiff's favor, *Faber*, 648 F.3d at 104, the complaint asserts "claim[s] related to a 'continuous series of events giving rise to a cumulative injury,'" resulting from Defendants' ongoing refusal to properly address Plaintiff's stomach issues and "provide recommended treatments." *Shomo*, 579 F.3d at 182 (alteration adopted) (quoting *Heard v. Sheahan*, 253 F.3d 316, 320 (7th Cir. 2001)); *cf. Lucente*, 980 F.3d at 309 (continuing violation doctrine "applies to claims composed of a series of separate acts that collectively constitute one unlawful practice" (cleaned up)).

Plaintiff has also plausibly alleged that each Defendant undertook acts in furtherance of that policy within the statutory period. (*Contra* Dkt. No. 32, at 15–16). Specifically, he explains that as late as June 2022 he continued to "visit[] sick call" and "repeatedly inquired" about his prescribed injections, but "Cheri, Ramineni, and Samad" all "ignored or rebuffed" his requests,

despite having authority to act on them. (*See* Dkt. No. 30, ¶¶ 11–13, 53, 55–56, 71–73). He also

alleges that GI specialists sent treatment recommendations "directly" to Ramineni—who, with

Samad, denied him that care through June 2022—and that Samad "personally represented" to

Plaintiff between April 2020 and July 2022 that "he did not believe Plaintiff had Crohn's disease,

and refused [Plaintiff] proper treatment as a result." (*Id.* ¶¶ 49, 58, 64). Accordingly, the

continuing violation doctrine applies to Plaintiff's Eighth Amendment claims, and those claims

are timely. *Shomo*, 579 F.3d at 182.

### B.    Deliberate Indifference

Defendants also argue that Plaintiff failed to plausibly allege an Eighth Amendment

claim. (Dkt. No. 32, at 9–12). Plaintiff disagrees. (Dkt. No. 33, at 12–14, 17–18).

The Eighth Amendment, applicable to the states through the Fourteenth Amendment, *see*

*Robinson v. California*, 370 U.S. 660, 666–67 (1962), prohibits the infliction of cruel and

unusual punishment. U.S. Const. amend. VIII. "In order to establish an Eighth Amendment claim

arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to his

serious medical needs.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (alteration

adopted) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). That standard "includes both

subjective and objective components." *Id.*; *see also Clark v. Valletta*, 157 F.4th 201, 209 (2d Cir.

2025). To satisfy the objective component, "the alleged deprivation must be sufficiently serious."

*Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway v. Coughlin*, 99 F.3d 550,

553 (2d Cir. 1996)). To satisfy the subjective component, an "official must both be aware of

facts from which the inference could be drawn that a substantial risk of serious harm exists, and

he must also draw the inference." *Clark*, 157 F.4th at 209 (quoting *Farmer v. Brennan*, 511 U.S.

825, 837 (1994)). Additionally, the official must "have the ability to take some action to alleviate

th[e] risk." *Suarez v. Morton*, 170 F.4th 33, 61 (2d Cir. 2026). Defendants here challenge both the objective and subjective components. (Dkt. No. 32, at 10–12).

As to the objective, Plaintiff suffered a "sufficiently serious" deprivation. *Hill*, 657 F.3d at 122. Defendants' prolonged failure to treat Plaintiff's stomach issues led to his suffering substantial pain, boating, nausea, rapid weight loss, vomiting, and an inability to eat. (*See* Dkt. No. 30, ¶¶ 24–25, 30–34, 43, 48, 51, 56, 59). That failure culminated in Plaintiff's first hospitalization, after which Defendants refused to administer the treatments specifically prescribed by specialists, resulting in a second hospitalization. (*See id.* ¶¶ 39–40, 42–52, 55–62, 64). These allegations collectively describe "'a condition of urgency' that may result in 'degeneration' or 'extreme pain,'" so the objective component is satisfied. *See Chance*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)); *cf. Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003) (prisoners need not suffer "pain that is at the limit of human ability to bear," nor a "condition [that] will degenerate into a life-threatening one").

Plaintiff has also plausibly alleged the subjective component. Plaintiff described to each Defendant his condition and the symptoms he experienced as a result; each also had access to his medical records detailing his condition, symptoms, and treatment prescribed during his hospitalization. (*See* Dkt. No. 30, ¶¶ 22, 24–29, 35, 38, 46, 48, 55–57). Moreover, Plaintiff's GI specialists sent their prescriptions to Ramineni "directly," and Samad told Plaintiff that "he did not believe Plaintiff had Crohn's Disease," despite multiple outside doctors confirming that diagnosis. (*Id.* ¶¶ 49, 64). Accordingly, Plaintiff has sufficiently alleged that Defendants—each of whom had "the ability to take some action to alleviate" the risk to Plaintiff, *Suarez*, 170 F.4th at 61—were "aware of facts from which" they could draw the inference "that a substantial risk of serious harm exist[ed], and [that each] also dr[ew] the inference." *Clark*, 157 F.4th at 209

11

(quoting *Farmer*, 511 U.S. at 837). Plaintiff has therefore stated plausible Eighth Amendment claims. *See Chance*, 143 F.3d at 702.

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 32) is **DENIED**.

**IT IS SO ORDERED.**

Dated: <u>June 29, 2026</u>
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge